UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-23156-CIV-ALTMAN

**CHRISTOPHER SUTTON**,

       *Petitioner,*

*v.*

**RICKY D. DIXON, SECRETARY,
DEPARTMENT OF CORRECTIONS**,

       *Respondent.*[1]

_____/

## ORDER

     Christopher Sutton is serving a life sentence in the custody of the Florida Department of Corrections for the crimes of first-degree murder, attempted first-degree murder, and armed burglary with an assault or battery. *See* Amended Petition [ECF No. 12] at 1. He's now filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutionality of his conviction and sentence. *Ibid.* The State maintains that the Amended Petition "is barred by the time limit provision of 28 U.S.C. § 2244(d)." Response to Order to Show Cause ("Response") [ECF No. 23] at 10. Sutton responds that his Petition is timely because his claims "are based upon newly discovered evidence" that shows "he is actually innocent[.]" Amended Petition at 13–14. After careful review, we agree with the State that Sutton's § 2254 petition is untimely under *both* § 2244(d) *and* the "actual innocence" exception.

---

[1] The original Respondent in this case, Mark S. Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021. Former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

THE FACTS

A grand jury in Miami-Dade County indicted Sutton and a codefendant, Garrett Kopp, on charges of first-degree murder with a deadly weapon (Count 1), attempted first-degree murder with a deadly weapon (Count 2), attempted felony murder (Count 3), and armed burglary with an assault or battery (Count 4). *See* Indictment [ECF No. 36-2] at 4–6. The State alleged that Sutton hired Kopp to break into the home of John and Susan Sutton[2]—Sutton's parents—and kill them so that Sutton could inherit their "considerable money and assets." State's Direct Appeal Answer Brief [ECF No. 36-2] at 71–73. Although Kopp succeeded in killing Susan, John "survived the attack, but was permanently blinded as a result of his injuries." *Id.* at 71. On July 21, 2010, after a jury found Sutton guilty of all four counts, the trial court sentenced Sutton to three consecutive life sentences on Counts 1, 2, and 4, and an additional life sentence on Count 3—to be served concurrently with the other three. *See* Judgment and Sentencing Order [ECF No. 36-2] at 11–16.

In his appeal to the Third DCA, Sutton advanced the following three arguments: (1) that the trial court erred in allowing John to remain in the courtroom during the trial, even though his "facial injuries and his blindness, which resulted from the attempted homicide, emotionally impacted the jury and undermined the [jury's] impartiality"; (2) that the trial court erred "in allowing the State to introduce collateral crime evidence that [Sutton] and Garrett Kopp burglarized Jose Peon's apartment and stole marijuana"; and (3) that Sutton's convictions for attempted first-degree murder and attempted felony murder "violated double jeopardy" because they both arose "from a single homicide attempt[.]" Direct Appeal Initial Brief [ECF No. 36-2] at 45. The Third DCA affirmed Sutton's conviction and sentence in an unwritten opinion on May 23, 2012. *See Sutton v. State*, 88 So. 3d 951, 951 (Fla. 3d DCA 2012).

---

[2] Since the Petitioner and the victims share the same last name, we'll refer to the victims by their first names (John and Susan) from here on out. We'll refer to Christopher Sutton as either "the Petitioner" or Sutton.

2

On June 6, 2014, Sutton, through counsel, filed a motion for postconviction relief under FLA. R. CRIM. P. 3.850. *See* First Postconviction Motion [ECF No. 36-3] at 2–25. In this First Postconviction Motion, Sutton presented five grounds for relief: (1) that trial counsel was ineffective in failing to object to the State's "prejudicially altered phone records exhibit," which incorrectly "implied that it was a complete record of Christopher Sutton's telephone communication with Kopp," *id.* at 12, 14; (2) that trial counsel was ineffective for failing to move to strike the jury panel after the venire observed another judge's "evident relationship with the victim and alignment with the prosecution," *id.* at 15; (3) that trial counsel was ineffective for failing to introduce exculpatory evidence that Teddy Montoto (remember this name), John's former law partner, had been involved in an affair with Susan and "had embezzled $206,207 from [John's law firm,]" *id.* at 17; (4) that trial counsel was ineffective for failing to present evidence that Kopp "had knowledge that there was marijuana in Christopher Sutton's closet. . . . [which] would have supported the Defense theory that Kopp broke into the Sutton home to steal Christopher Sutton's marijuana," *id.* at 20; and (5) that Sutton had discovered new evidence, the affidavit of an inmate named John Flasco, which suggested that Kopp had lied at trial because Flasco overhead Kopp "bragging that he 'came up with a story' . . . and 'in return' [he] was 'able to avoid the death sentence or spending life in prison," *ibid.* The State filed a Response to the First Postconviction Motion, arguing that all five claims "should be denied without an evidentiary hearing." State's First Postconviction Response [ECF No. 36-3] at 65.

The state postconviction court entered a detailed written order on January 5, 2015, denying all five of Sutton's claims. *See* Order Denying First Postconviction Motion [ECF No. 36-3] at 68–73. The state court first denied all four ineffective-assistance-of-counsel claims because Sutton had failed to show that counsel performed deficiently. *See id.* at 69 ("As such, this allegation of deficiency is refuted by the record."). As for the newly-discovered-evidence claim, the state court first noted that Flasco's affidavit "does not mention Garrett Kopp by name" and "does not state specifically what Kopp

stated." *Id.* at 72. In any event, the state postconviction court found that Flasco's testimony would have been conclusively refuted by the testimony of Jose Peon, who "testified very credibly that Defendant asked him if he knew of any hit men, and that Defendant stated he wanted to kill his parents because they had money and life insurance." *Ibid.* Sutton appealed the denial of the First Postconviction Motion, but the Third DCA affirmed the lower court in an unwritten opinion. *See Sutton v. State*, 163 So. 3d 1212, 1212 (Fla. 3d DCA 2015). The Third DCA's mandate issued on May 4, 2015. *See* First Postconviction Appeal Docket [ECF No. 36-3] at 130.

On August 19, 2019,[3] Sutton—now proceeding *pro se*—filed a second Rule 3.850 Postconviction Motion in state court. *See* Second Postconviction Motion [ECF No. 36-4] at 2–19. The Second Postconviction Motion raised another newly-discovered-evidence claim based on the affidavits of two individuals: Ryan Laitinen[4] and Dennis J. Smith. *Id.* at 6; *see also* Laitinen Letter [ECF No. 36-4] at 22–26; Smith Affidavit ("Smith Aff.") [ECF No. 36-4] at 27–28. According to Sutton, these two documents showed that Teddy Montoto, not Sutton, hired Kopp to murder John and Susan. *See* Second Postconviction Motion at 15–16 ("[T]he only person who the evidence available at the time would show was ready and able to [pay Kopp] was Mr. Montoto. . . . At this point however, this Court has been presented with Affidavits which clearly comprise newly discovered and material evidence[.]").

The state postconviction court denied the Second Postconviction Motion in a comprehensive written order. *See* Order Denying Second Postconviction Motion [ECF No. 36-4] at 68–71. *First*, it

---

[3] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).
[4] Laitinen originally made his allegations in a letter addressed to Sutton. *See* Laitinen Letter [ECF No. 36-4] at 22–26. On April 29, 2019, however, Laitinen executed an affidavit in which he swore that the contents of his letter were true and accurate. *See* Laitinen Affidavit [ECF No. 36-4] at 20–21. Since Laitinen's affidavit merely affirms the veracity of his letter, we'll focus our analysis on the contents of the letter.

4

found that the Laitinen Letter could not be classified as "newly discovered evidence" because it was "discoverable before trial" or, at worst, "before Defendant filed his first motion for postconviction relief." *Id.* at 68. *Second*, it concluded that the Smith Affidavit didn't meet the standard for "newly discovered evidence" because "[t]here is no indication when Defendant heard about the conversation or when Defendant had the conversation with Smith," and because Sutton "cannot show that this evidence was not discoverable by due diligence." *Id.* at 69. *Third*, the court determined that—even if the Laitinen Letter and the Smith Affidavit *were* admissible—Sutton's efforts to blame Montoto for these crimes was "refuted by the record." *Id.* at 70. Sutton again appealed to the Third DCA, which (again) affirmed in an unwritten opinion, with its mandate issuing on June 26, 2020. *See Sutton v. State*, 302 So. 3d 887, 887 (Fla. 3d DCA 2020); Second Postconviction Appeal Docket [ECF No. 36-4] at 129.

Sutton filed his first § 2254 Petition on July 27, 2020. *See* Petition [ECF No. 1]. After U.S. Magistrate Judge Lisette M. Reid instructed Sutton to file an amended petition that complied with our Local Rules, we dismissed the Petition without prejudice because Sutton had "failed to file [an] amended petition by August 24, 2020." *Sutton v. Inch*, 2020 WL 6149601, at *1 (S.D. Fla. Oct. 20, 2020) (Altman, J.). We also remarked that Sutton's habeas petition "is (very likely) time-barred," though we acknowledged Sutton's suggestion "that he might qualify for one of two exceptions to § 2244(d)(1)(A)'s time bar." *Id.* at *2–3. We ultimately vacated that order when Sutton filed the Amended Petition, in which he alleged that he "'never received' the Order to Amend." Order Vacating Dismissal Order [ECF No. 17] at 2 (quoting Motion for Reconsideration [ECF No. 11] at 1). Sutton's Amended Petition is now ripe for review.

## THE LAW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that "a person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in

federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). This limitations period can be tolled for any period "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending" before the state court. *Id.* § 2244(d)(2).

There are also two equitable exceptions to the one-year window, under either of which we may consider a habeas petition even if it's untimely under § 2244(d)(1). The first exception—equitable tolling—requires a petitioner to "show (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (cleaned up). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Holland v. Florida*, 560 U.S. 631, 653 (2010) (cleaned up). The second exception—actual innocence—only applies in cases where the petitioner proffers "new evidence show[ing] 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of justifying the application of either exception. *See Cole v. Warden, Ga. State Prison*, 768 F.3d 1150, 1158 (11th Cir. 2014) ("The petitioner has the burden of

establishing his entitlement to equitable tolling; his supporting allegations must be specific and not conclusory."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" (quoting *Schlup*, 513 U.S. at 324)).

**ANALYSIS**

The Amended Petition asserts three grounds for relief—all centered around the allegations Sutton made in his Second Postconviction Motion. *First*, he contends that the State violated the strictures of *Brady v. Maryland*, 373 U.S. 83 (1963), when it withheld Laitinen's statement implicating Montoto in the murder-for-hire plot. *See* Amended Petition at 6 ("There was in fact evidence [that Montoto was involved in the murder] in the form of Ryan Laitinen, a material exculpatory witness knowingly suppressed by the state and their agent [Detective] Belyeu."). *Second*, he insists that the state postconviction court violated the Constitution when it summarily denied his Second Postconviction Motion without "hold[ing] an evidentiary hearing [to] weigh all of the 'new' evidence and the 'new' suppressed evidence in a cumulative manner to determine the impact it would have had on the trial." *Id.* at 8. *Third*, Sutton castigates his trial counsel for failing to investigate (and develop at trial) Montoto's motive and opportunity to harm the victims. *See id.* at 10 ("These unprofessional errors made by trial counsel to not develop a clearly more culpable suspect [who] wanted John and Susan Sutton dead . . . [is a] strategy no competent counsel would fail to at least investigate[.]").

We begin, though, with an assessment of the Amended Petition's timeliness. In a prior order, we observed that Sutton's "judgment [ ] became final on August 21, 2012—and, as a result, [Sutton] had until August 20, 2013 to file his habeas petition in federal court. Since he didn't file this Petition until July 27, 2020—almost seven years too late—it is (very likely) time-barred." *Sutton*, 2020 WL 6149601, at *2. We also pointed out that Sutton didn't file an "application for State post-conviction

7

or other collateral review" until June 6, 2014, meaning that AEDPA's limitations period wasn't tolled under § 2244(d)(2) until the statute of limitations had already elapsed. *See id.* at 2 n.3 ("[O]n June 6, 2014, nearly two years after his conviction became final, the Petitioner moved to vacate his conviction (and for a new trial) under FLA. R. CRIM. P. 3.850. . . . But all of this is really beside the point because even a proper state-court motion cannot toll an already-expired statute of limitations." (citing *Tinker v. Moore*, 255 F.3d 1331, 1333 (11th Cir. 2001))).

Our review of the full state-court record now confirms our initial suspicions. Sutton's state-court conviction became final on August 21, 2012—ninety days after the Third DCA affirmed his conviction and sentence, *see Sutton*, 88 So. 3d at 951[5]—and AEDPA's limitations period ran uninterrupted until Sutton filed the First Postconviction Motion on June 6, 2014, nearly a whole year after the time limit set forth in § 2244(d)(1)(A) had already expired. *See* First Postconviction Motion [ECF No. 36-3] at 2–25.

Sutton, to his credit, doesn't dispute this. He, instead, relies on two alternative means of asserting timeliness. *First*, he tries to avail himself of the (more generous) limitations period in § 2244(d)(1)(D). Here, he says (1) that he first learned about Laitinen's exculpatory statement from "a letter dated 18 November 2018," and (2) that he subsequently received Dennis Smith's affidavit on May 21, 2019. Amended Petition at 13. Sutton insists, then, that November 18, 2018, is "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," and that—as a result—he's still got 57 days of untolled time under § 2244(d)(1)(D). *Ibid.* ("275 days elapsed between the date on which the factual basis of the claim or

---

[5] When (as in this case) a Florida habeas petitioner declines to appeal to the Florida Supreme Court or United States Supreme Court, a conviction becomes final 90 days after the Florida district court of appeal affirms the conviction in an opinion. *See Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) ("The Florida appellate court affirmed Chavers' conviction on November 22, 2000, although the mandate was not issued until December 8, 2000. The one-year statute of limitations period began to run 90 days from the earlier date, on February 20, 2001, because that is when the time for seeking Supreme Court review expired.").

claims presented could have been discovered through the exercise of due diligence. . . . 31 days have elapsed between the issuance of the mandate on appeal from the adverse ruling on Petitioners [sic] state postconviction motion and the filing of the instant petition."). *Second*, Sutton claims that, even if § 2244(d)(1)(D) doesn't apply, the Laitinen Letter and the Smith Affidavit show that he's actually innocent of the crimes he was accused of. *See id.* at 13–14 ("[Sutton] asserts that the exception created under [*McQuiggin*] applies to this case as he is actually innocent as defined in [*Schlup*].]"). We'll address each of these arguments in turn.

### A. The Amended Petition is Untimely Under § 2244(d)(1)(D)

Under § 2244(d)(1)(D), AEDPA's one-year limitations window begins on "the date on which the factual predicate of [a] claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). "Newly discovered evidence" that purportedly exculpates a habeas petitioner is a classic example of the sort of new "factual predicate" that triggers § 2244(d)(1)(D). *See, e.g.*, *Wheeler v. Dep't of Corr.*, 2018 WL 11233240, at *2 (M.D. Fla. May 21, 2018) (Merryday, J.) ("Wheeler asserts entitlement to another limitation under Section 2244(d)(1)(D) based on newly discovered evidence."). But this limitations period "begins when the factual predicate of a claim could have been discovered using due diligence, *not when it was actually discovered*." *Melson v. Allen*, 548 F.3d 993, 999 (11th Cir. 2008) (emphasis added), *vacated on other grounds by* 561 U.S. 1001 (2010). Whether a petitioner has demonstrated due diligence is "determined on a case-by-case basis relative to the factual predicate." *Cole*, 768 F.3d at 1156. Although due diligence "does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option," *Aron v. United States*, 291 F.3d 708, 712 (11th Cir. 2002), the petitioner must still "'show some good reason why he or she was unable to discover facts' at an earlier date," and he must establish that an earlier "reasonable investigation" would not have uncovered the same facts, *Melson*, 548 F.3d at 999 (quoting *In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997)).

In the State's view, § 2244(d)(1)(D) doesn't apply for two reasons. *First*, as the State points out, the state postconviction court found that the Laitinen Letter and the Smith Affidavit *did not* qualify as "newly discovered evidence" *under state law* because they could have been discovered earlier through additional diligence—which, as a practical matter, means that Sutton didn't exercise the kind of "due diligence" he would've needed to trigger § 2244(d)(1)(D). *See* Response at 13 ("The motion was denied by the trial court . . . based on a finding that Petitioner could not show that the evidence was not discovered by due diligence[.]"). *Second*, according to the State, the state postconviction court found that the Second Postconviction Motion was "not properly filed." *Id.* at 14. If this is true, then the Second Postconviction Motion didn't toll § 2244(d)(1)(D)'s limitations period at all—which would mean that Sutton's filing window would have closed one year after he discovered the newly exculpatory evidence: November 18, 2019. We find the State's second argument persuasive and conclude, given the state postconviction court's factual findings, that the Second Postconviction Motion didn't toll § 2244(d)(1)(D)'s limitations period.

Generally speaking, AEDPA's limitations period is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" 28 U.S.C. § 2244(d)(2); *see also Kearse v. Sec'y, Fla. Dep't of Corr.*, 736 F.3d 1359, 1362 (11th Cir. 2013) ("In order to toll the statute of limitations, the application for state postconviction relief must be properly filed."). A state postconviction motion is "properly filed" when "its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). An *untimely* state postconviction motion thus doesn't toll AEDPA's limitations period. *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)." (cleaned up)); *see also Walton v. Sec'y, Fla. Dep't of Corr.*, 661 F.3d 1308, 1310 (11th Cir. 2011) ("An application for postconviction relief filed in state court is not 'properly filed' if it is untimely.").

10

In our case, Sutton's Second Postconviction Motion was *both* "untimely" (it was filed "more than 2 years after [his] judgment and sentence bec[a]me final," FLA. R. CRIM. P. 3.850(b)) *and* "successive" (since he'd already filed a "prior [Rule 3.850] motion"), *see* FLA. R. CRIM. P. 3.850(h)(2); *see generally* First Postconviction Motion [ECF No. 36-3] at 2–25. To compensate for these procedural defects, Sutton had to prove that his new collateral claims were predicated on facts that "were unknown to [him or his lawyer] and could not have been ascertained by the exercise of due diligence[.]" FLA. R. CRIM. P. 3.850(b)(1); *see also Kimbrough v. Sec'y, Fla. Dep't of Corr.*, 809 F. App'x 684, 692–93 (11th Cir. 2020) ("For his successive motion to be timely, Kimbrough was required under Rule 3.850(b)(1) to demonstrate that newly discovered evidence—that is, evidence that he could not have discovered earlier through the exercise of due diligence—supported his competency claims[.]").[6] To qualify as "newly discovered evidence" within the meaning of Rule 3.850(b)(1), the postconviction movant must show: (1) that the evidence was "unknown by the trial court, by the party, or by counsel at the time of trial, and [that] defendant or his counsel could not have known of it by the use of diligence," and (2) that the evidence is "of such nature that it would probably produce an acquittal on retrial." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (cleaned up).

By concluding that Sutton failed to produce "newly discovered evidence," the state postconviction court implicitly found that the Second Postconviction Motion was untimely under state law. The Second Postconviction Motion thus *didn't* toll AEDPA's statute of limitations at all. The state postconviction court explained that "[t]he affidavit/letter of Ryan Laitinen is not newly discovered evidence" because it was "discoverable before trial." Order Denying Second

---

[6] The exceptions to Rule 3.850(b)'s time-bar and Rule 3.850(h)'s prohibition on successive motions aren't identical—but, as a practical matter, a "properly filed" newly-discovered-evidence claim will usually satisfy both procedural hurdles. *See, e.g., Forbes v. State*, 269 So. 3d 677, 679 (Fla. 2d DCA 2019) ("Ms. Forbes' newly discovered evidence claim was filed timely based upon her professed November 2014 discovery of the uncommunicated probationary plea offer. Further, a newly discovered evidence claim may be an exception to the general prohibition on successive rule 3.850 motions." (cleaned up)).

Postconviction Motion [ECF No. 36-4] at 68. And, in the court's view, Sutton also failed to show that the Smith Affidavit "was not discoverable by due diligence"—and, therefore, failed to present "newly discovered evidence" under Rule 3.850(b)(1). *Id.* at 69. Having determined that neither the Laitinen Letter nor the Smith Affidavit constituted "newly discovered evidence," the state postconviction court effectively concluded that the Second Postconviction Motion was both untimely and successive under Florida law. In other words, the Second Postconviction Motion wasn't *properly filed. See Hatcher v. Sec'y, Dep't of Corr.*, 2019 WL 4751755, at *4 (M.D. Fla. Sept. 30, 2019) (Conway, J.) ("However, the state court found the post-conviction motion to be untimely because Petitioner could have discovered the newly discovered evidence within the two-year limitation period for filing a timely Rule 3.850 motion. Consequently, Petitioner's second Rule 3.850 motion did not toll the limitations period."); *Kellum v. Sec'y, Dep't of Corr.*, 2022 WL 17832397, at *3 (M.D. Fla. Dec. 21, 2022) (Mizelle, J.) ("Even though the state court's order did not expressly deny the third postconviction motion as untimely, it is apparent that the state court's denial rested on the motion's untimeliness because the claims failed the state-law definition of 'newly discovered' evidence. . . . To proceed, Kellum needed to establish applicability of the newly discovered evidence exception to the limitation set out in Rule 3.850(b)(1). By finding that Kellum's allegations were insufficient to warrant the application of this exception, the state court necessarily found the motion untimely. . . . Therefore, since Kellum's third postconviction motion was rejected as untimely by the state court, it was not 'properly filed' and had no tolling effect on the AEDPA limitation period.").

In so holding, we're guided by the Eleventh Circuit's decision in *Jones v. Secretary, Florida Department of Corrections*, 906 F.3d 1339 (11th Cir. 2018)[7]—whose facts are virtually indistinguishable from ours. In *Jones*, a habeas petitioner filed an otherwise untimely Rule 3.850 motion in state court, arguing that Rule 3.850(b)(1)'s timeliness exception applied because "he had only recently learned of

---

[7] *cert denied sub nom. Jones v. Inch*, 139 S. Ct. 1384 (2019).

the [new facts] and that he could not have learned of it earlier with the exercise of due diligence." *Id.* at 1344–45. The state court found that these "allegations [did] not meet the parameters of newly discovered evidence" and denied the motion. *Id.* at 1345. In dismissing the petitioner's § 2254 petition as untimely, the federal district court concluded that "the Rule 3.850 Motion was not 'properly filed' under *Pace*," which meant that AEDPA's limitations period had expired while the petitioner's Rule 3.850 motion was pending. *Id.* at 1346 (citing *Jones v. Sec'y, DOC*, 2017 WL 275796, at *3 (M.D. Fla. Jan. 20, 2017) (Davis, J.)).

As Sutton does here, the petitioner argued on appeal that "the state court did not actually find the Rule 3.850 Motion untimely," but the Eleventh Circuit rejected this argument in two parts. *Ibid.* *First*, it found that, even though the state court didn't use the word "untimely," a federal court has its own obligation to determine "whether the [state postconviction motion] was timely under state law" if "the state court doesn't clearly rule on the timeliness of a post-conviction motion[.]" *Id.* at 1347–48 (citing *Gorby v. McNeil*, 530 F.3d 1363, 1367 (11th Cir. 2008)). In other words, a federal district court must "read between the lines" of a state court's decision and independently determine if the postconviction motion was untimely under state law. *See Walton*, 661 F.3d at 1312 ("When a state court has not addressed the timeliness of an application for collateral relief, the federal court 'must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness.'" (quoting *Evans v. Chavis*, 546 U.S. 189, 198 (2006))).

*Second* (and of more relevance here), a federal court *must* defer to a state court's decision that a postconviction motion is untimely—even if the state court doesn't explicitly base its decision on timeliness grounds. *See Jones*, 906 F.3d at 1348–49 ("[W]e conclude that the state trial court considered the issue and decided that the motion *was* untimely—albeit not clearly and unambiguously—and we are required to give deference to that ruling." (emphasis in original)). The Eleventh Circuit noted that, under Florida law, a Rule 3.850 motion *is* untimely if a state court determines "that the movants could

13

have discovered the alleged new evidence sooner[.]" *Id.* at 1349. Because the state court in *Jones* had determined that the habeas petitioner's allegations didn't "meet the parameters of newly discovered evidence" under state law, it effectively determined that the Rule 3.850 motion was untimely. *See ibid.* ("Florida cases are legion in denying Rule 3.850 motions when the alleged 'new evidence' could have been discovered within the rule's two-year deadline."); *see also Hatcher*, 2019 WL 4751755, at *4 ("However, the state court found the post-conviction motion to be untimely because Petitioner could have discovered the newly discovered evidence within the two-year limitation period for filing a timely Rule 3.850 motion."). And, since "the state court ruled that the Rule 3.850 motion was untimely," the federal habeas court was bound by that determination of state procedural law and was obliged to "defer to that ruling." *Jones*, 906 F.3d at 1350; *see also Stafford v. Thompson*, 328 F.3d 1302, 1305 (11th Cir. 2003) ("[A] petitioner's state court habeas corpus filing is not 'properly filed' within the meaning of § 2244(d)(2) if the state court has determined that the petitioner's state court filing did not conform with the state's filing deadlines.").

To recap, the state postconviction court found that *neither* the Laitinen Letter *nor* the Smith Affidavit were "newly discovered evidence" under Rule 3.850(b)(1), because both could have been discovered earlier through the exercise of due diligence. *See* Order Denying Second Postconviction Motion [ECF No. 36-4] at 68–69. Applying *Jones* to our facts, the state postconviction court's determination that Sutton failed to present newly discovered evidence constitutes a finding that the Second Postconviction Motion was untimely under Florida law. *See Jones*, 906 F.3d at 1350 ("We conclude that based on the language in the Trial Court Order, an untimeliness finding was subsumed within the state court's denial of relief because (according to that court) the petitioner could have discovered the new evidence several years before.").[8] That untimely Second Postconviction Motion

---

[8] True, the state postconviction court *also* addressed the Second Postconviction Motion on the merits. *See* Order Denying Second Postconviction Motion [ECF No. 36-4] at 71 ("Even if the information contained in the affidavits qualified as newly discovered evidence, it is not of a nature that it would

thus didn't toll AEDPA's limitations clock because it wasn't a "properly filed" application for postconviction relief. *See Pace*, 544 U.S. at 414 ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)." (cleaned up)). If we accept Sutton's claim that the § 2244(d)(1)(D) limitations period began to run on November 18, 2018 (*i.e.*, the day Sutton claims he first discovered the contents of the Laitinen Letter), the state postconviction court's ruling that the Second Postconviction Motion didn't satisfy Rule 3.850(b)(1) means that the one-year statute of limitations under § 2244(d)(1)(D) was never tolled and that it expired on November 18, 2019—over eight months *before* Sutton filed his initial § 2254 petition (on July 27, 2020).[9] *See Hatcher*, 2019 WL 4751755, at *4 ("However, the state court found the post-conviction motion to be untimely because Petitioner could have discovered the newly discovered evidence within the two-year limitation period for filing a timely Rule 3.850 motion. Consequently, Petitioner's second Rule 3.850 motion did not toll the limitations period.").

Since we cannot second guess the state court's application of state procedural law, we agree with the State that the Second Postconviction Motion wasn't "properly filed" and that AEDPA's most recent limitations period for the Laitinen Letter expired on November 18, 2019—one year after "the factual predicate of the claim or claims could have been discovered through the exercise of due

---

probably produce an acquittal on retrial or yield a less severe sentence."). But the Eleventh Circuit has held that, "when a state court determines that a petition is untimely, and also rejects the substantive claim on the merits, the timeliness decision *standing alone* compels a federal court to conclude that the state motion was not 'properly filed.'" *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318 (11th Cir. 2006) (emphasis added) (citing *Carey v. Saffold*, 536 U.S. 214, 226 (2002)).

[9] A newly-discovered-evidence claim based solely on the Smith Affidavit would also be untimely. Sutton asserts that Smith "executed his affidavit [on] 21 May 2019," Amended Petition at 13, but the Smith Affidavit *itself* indicates that Sutton knew about its contents *before* the affidavit was executed, *see* Smith Aff. at 28 ("[Sutton] heard about the story I told the guys, and said he knew the guy and that I might be able to help him because Kop was his codefendant who testified that Chris was with him that night and mentioned nothing of Teddy."). Even assuming, however, that the § 2244(d)(1)(D) limitations period for the Smith Affidavit began on May 21, 2019, it *still* would have expired two months before Sutton filed his initial § 2254 petition (on July 27, 2020).

diligence." 28 U.S.C. § 2244(d)(1)(D). For the same reasons, the limitations period for the Smith Affidavit expired on May 21, 2020. Either way, Sutton's July 27, 2020 Petition is untimely.

## B. The "Actual Innocence" Exception Doesn't Apply

Sutton's only other option is to show that, given the contents of the Laitinen Letter and the Smith Affidavit, he qualifies for the actual-innocence exception. To satisfy this exception, "the petitioner (1) [must] present new reliable evidence that was not presented at trial, and (2) [must] show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt in light of the new evidence." *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1011 (11th Cir. 2012) (cleaned up). "New reliable evidence" includes "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence[.]" *Schlup*, 513 U.S. at 324. This evidence "must raise a sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Johnson v. Fla. Dep't of Corr.*, 513 F.3d 1328, 1334 (11th Cir. 2008) (cleaned up). The new evidence must also show that the petitioner is *factually* innocent of the charged offenses; it isn't enough, in other words, for the petitioner merely to undermine the *legal* sufficiency of the conviction. *See Bousley v. United States*, 523 U.S. 614, 623 (1998) ("It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency."). Unlike the limitations period of § 2244(d)(1)(D), the actual-innocence exception doesn't require Sutton to prove that he couldn't have discovered the evidence sooner with reasonable diligence. It requires, instead, that the new evidence be more likely than not to persuade a reasonable juror that he's not guilty. *See McQuiggin*, 569 U.S. at 395 ("Section 2244(d)(1)(D) is both modestly more stringent (because it requires diligence) and dramatically less stringent (because it requires no showing of innocence).").

Sutton believes that the Laitinen Letter and the Smith Affidavit meet this rigorous standard, because they suggest that Montoto (not Sutton) hired Kopp to kill John and Susan. Let's start by summarizing what Laitinen and Smith actually said in these documents. The Laitinen Letter recounts

16

a TV special Laitinen saw, years after Sutton's conviction, in which Detective Belyeu was interviewed about Sutton's case. Laitinen was surprised when Detective Belyeu "said a lot on the show but nothing of what I told him over the phone or in person." Laitinen Letter at 22. Laitinen had called the police after he learned that Kopp was involved in the murder of John and Susan, and Detective Belyeu came to interview him at his home. *Ibid.* Laitinen told Detective Belyeu that he and Kopp were friends, and that Kopp was involved in drug-dealing and petty theft. *See id.* at 23 ("We would often go [downtown] and break into cars searching trunks and glove boxes, under the seats and taking expensive car stereos."). During one of his car thefts—Laitinen told Belyeu—Kopp found a Glock 9mm handgun, which he later kept with him all the time. *See id.* at 24 ("When we went to trade all the stuff we came up with for drugs he wouldn't come off of that Glock for anything in the world. . . . He was always carrying it[.]").

Laitinen and Kopp also had a job cleaning John Sutton's law offices on the weekends. *Ibid.* One such weekend, Laitinen remembered Kopp being called into Teddy Montoto's office "for a long time." *Ibid.* When Kopp emerged, Laitinen noticed that "he seemed pretty happy," that he had "a thousand dollars in hundred dollars bills," and that Kopp was bragging that "Teddy was going to help him get custody of his kid and give him a hundred grand." *Ibid.* When Laitinen pressed Kopp for details, Kopp "got offended and said 'well . . . just how much am I supposed to charge for a couple of bodies?'" *Ibid.* Later, Kopp showed Laitinen a second gun, which Montoto had apparently bought for him, as well as a picture of Montoto holding a shoebox filled with cash. *Ibid.* After Kopp was arrested on an unrelated charge, Kopp purportedly complained to Laitinen that Montoto "wouldn't pay him for half a job" and contemplated "breaking into Teddy's house since he knew his money was there." *Id.* at 25. Laitinen was afraid of telling the police (or Sutton) about what Kopp was telling him because Kopp was "claiming to be a hitman." *Ibid.* But, once Kopp was arrested again (this time for his attack on John and Susan), Laitinen finally "decided to call the cops." *Ibid.* When he told Detective

Belyeu all of this, Laitinen alleges that the detective became "pretty upset with me" and kept asking him about Sutton. *Id.* at 26.

In his affidavit, Dennis Smith repeated a story he had previously told "a few guys I know from Miami" while he was incarcerated at Madison Correctional Institution. Smith Aff. at 27. Smith claims that, while he worked at a "trap" in Miami, a "little white guy" he knew as "Kop" would come by to sell car stereos or other parts for money and narcotics. *Ibid.* One day, "Kop" came by and asked to buy a gun for "a guy named Teddy." *Ibid.* Smith initially refused to sell the firearm to "Kop" unless he had cash on hand. *Ibid.* Later that day, "Kop" and "Teddy" came back together, purchased the gun, and "hauled ass out of the spot like a rocket[.]" *Id.* at 28. When Sutton—who was also housed at Madison Correctional Institution at the time—heard about Smith's story, he asked Smith to memorialize the story in an affidavit. *See ibid.* ("Chris heard about the story I told the guys, and said he knew the guy and that I might be able to help him because Kop was his codefendant . . . Chris then showed me a picture from Teddy's obituary to make sure we were talking about the same guy.").

In the state postconviction court's view, the trial evidence conclusively proved that Sutton, not Montoto, hired Kopp to kill John and Susan—so the Laitinen Letter and the Smith Affidavit were "not of a nature that . . . would probably produce an acquittal on retrial or yield a less severe sentence." Order Denying Second Postconviction Motion [ECF No. 36-4] at 71. The court noted that "Defendant's prior attempt to blame Montoto as the murderer failed for lack of evidence. In the instant motion, he attempts to allege evidence. The claim is refuted by the record." *Id.* at 70. In saying so, the state postconviction court specifically relied on the testimony of five witness: Juliette Driscoll, Sutton's then-girlfriend; Jose Peon, a Sutton associate; Lieutenant Rosanna Cordero-Stutz, a homicide investigator; Detective Larry Belyeu, the lead detective; and, of course, Garrett Kopp himself. *Ibid.*

Driscoll testified that Sutton frequently argued with his parents about money and bitterly complained to her that John and Susan "needed to pay with their lives for what they did to him." Trial

Tr. Vol. 9 [ECF No. 24-9] at 60–61.[10] Driscoll also explained that, "for the last . . . six years," Sutton had talked about "getting his parents killed or taken care of[.]" *Id.* at 64–65. Peon added that Sutton had asked him if he "knew of any hitman that would kill his parents," and he told the jury that Sutton had said he wanted to kill John and Susan to collect "the insurance money and the properties that his parents owned." Trial Tr. Vol. 8 [ECF No. 24-8] at 87–88 Lieutenant Cordero-Stutz testified that, when she told Sutton about the attack on his parents, Sutton said something "very unusual": He suddenly volunteered that "he had been at the movie theater the night before and that he had the movie stubs, and if I wanted the movie stubs." *Id.* at 49.[11] Detective Belyeu testified that, when he confronted Sutton with the phone records of his calls with Kopp, Sutton "immediately began to sob," repeatedly said "I'm fucked," and asked Detective Belyeu what's "the minimum, maximum time I can do or that I would be looking at?" Trial Tr. Vol 15 [ECF No. 24-15] at 30–31. Finally, Kopp testified— even in the face of "aggressive[ ] cross-examin[ation,]" Order Denying Second Postconviction Motion [ECF No. 36-4] at 71—that Sutton, and not Montoto, had hired him to kill John and Susan, *see* Trial Tr. Vol. 10 [ECF No. 24-10] at 77 ("Q: And did you tell Detective Belyeu that the person with whom you were in agreement or had the plan to do it for was the defendant, Christopher Sutton? A: Yes.").

---

[10] The trial testimony established that Sutton held a deep-seated grudge against his parents for sending him to a boarding school in Samoa when he was a teenager. *See, e.g.,* Trial Tr. Vol. 9 [ECF No. 24-9] at 55 ("Q: And when [Sutton] spoke to you about his experiences in Samoa and his anger at his parents having sent him there for over two and a half years, was he angry with them? [Driscoll:] Yes."); Trial Tr. Vol. 12 [ECF No. 24-12] at 13 ("Q: And did [Sutton] tell you about an attitude or feeling he had towards his parents because they had sent him [to Samoa]? [Emma Pacetti:] Yes, he definitely felt that it was unfair, and he wasn't happy that he was sent there to be abused."); Trial Tr. Vol. 17 [ECF No. 24-17] at 58–59 ("Q: Ok, and you were not happy—how did you feel about your parents [when you found out that you weren't going to leave the program on your eighteenth birthday]? [Sutton:] I was angry.").

[11] Defense counsel successfully objected to Lieutenant Cordero-Stutz's opinion that Sutton's statement was "very unusual." Trial Tr. Vol. 8 [ECF No. 24-8] at 49. But, during cross-examination, defense counsel confronted Lieutenant Cordero-Stutz about her testimony that the statement was unusual. *See id.* at 77 ("Q: Now, you talked about how Christopher had told you he had been to the movies the night before[?] A: Yes. Q: And you thought that was unusual? A: Yes."). Since it was defense counsel that elicited this statement in front of the jury, it's perfectly appropriate for us to consider it now.

The state postconviction court's factual finding that the evidence at trial conclusively proved Sutton's guilt—and that the trial evidence *wasn't* "refuted" by the Laitinen Letter and the Smith Affidavit—is fatal to Sutton's actual-innocence claim. Under AEDPA, "a determination of a factual issue made by a State court *shall be presumed to be correct*." 28 U.S.C. § 2254(e)(1) (emphasis added). Sutton can only "rebut[ ] th[is] presumption of correctness" by adducing "clear and convincing evidence" that the state postconviction court got it wrong. *Ibid.* "Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt. Indeed, . . . review of findings of fact by the state court under § 2254(e)(1) is even more deferential than under a clearly erroneous standard of review." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1309 (11th Cir. 2012); *see also Turner v. Crosby*, 339 F.3d 1247, 1273 (11th Cir. 2003) ("[T]he state court's findings of fact are entitled to a presumption of correctness and may be ignored only if the petitioner shows by clear and convincing evidence that the state court's determination was not fairly supported by the record. . . . This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record.").

Sutton provides no additional evidence—let alone "clear and convincing evidence"—that the state postconviction court's findings "[were] not fairly supported by the record." *Turner*, 339 F.3d at 1273. Instead, he castigates the state postconviction court for failing to "hold[ ] an evidentiary hearing . . . to weigh all of the 'new' evidence and the 'new' suppressed evidence in a cumulative manner to determine the impact it would have on the trial." Amended Petition at 8. But that isn't "clear and convincing evidence" of anything. Sutton doesn't dispute that several witnesses testified about his oft-expressed desire to kill his parents; that he had a close, long-standing (and often criminal) relationship

with Kopp;[12] or that—after hearing about the evidence the detectives had adduced—he began to sob and repeatedly exclaimed "I'm fucked," Trial Tr. Vol 15 [ECF No. 24-15] at 30, before asking how much time he would have to serve in prison, *see id.* at 30–31; *see also* Order Denying Second Postconviction Motion [ECF No. 36-4] at 70–71 (summarizing the relevant testimony).

With evidence that strong, we'd be hard-pressed to second-guess the state postconviction court's factual determination that the Laitinen Letter and the Smith Affidavit were "not of a nature [that] would probably produce an acquittal on retrial or yield a less severe sentence." Order Denying Second Postconviction Motion [ECF No. 36-4] at 71; *see also Cosey v. Lilley*, 62 F.4th 74, 83 (2d Cir. 2023) ("[I]t should be particularly difficult to establish clear and convincing evidence of error on the state court's part." (quoting *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010))); *Herring v. Inch*, 2021 WL 4777486, at *4 (N.D. Fla. July 15, 2021) (Cannon, Mag. J.) (rejecting a recanting witness's affidavit as proof of actual innocence because the "[p]etitioner has not rebutted the state's court's factual determination[ ]" that "Anderson's sworn statement is in direct contradiction with the overwhelming evidence presented at trial"), *report and recommendation adopted*, 2021 WL 4776075 (N.D. Fla. Oct. 13, 2021) (Stafford, J.); *cf. Huguley v. Folks*, 2009 WL 348889, at *7 (M.D. Ala. Feb. 11, 2009) (Watkins, J.) ("Based on an exhaustive review of the record in its entirety, the court concludes that the Clark affidavit does not throw Huguley's conviction into doubt. Specifically, this new evidence is overwhelmed by the weight of all the other evidence before the court and, thus, such evidence fails to raise a question as to Huguley's factual innocence.").

To understand why, assume for a moment that the Laitinen Letter and the Smith Affidavit— two documents composed by convicted felons *years after* the Sutton trial ended—brought the balance

---

[12] *See* Trial Tr. Vol. 9 [ECF No. 24-9] at 40 ("[Driscoll]: Chris would just have [Kopp] do stuff for him, kind of boss him around a lot. I think Garrett kind of looked up to him like an older brother sort of thing."); Trial Tr. Vol. 17 [ECF No. 24-17] at 95 ("[Defense Counsel]: And did you develop any type of business relationship with Garrett Kopp? [Sutton]: Yes. . . . I was selling drugs. I supplied him with drugs. [Kopp] would sell them on the corner, and I would sell them, too.").

of the evidence into a kind of equipoise. Imagine, in other words, that—in terms of their persuasiveness—these two post-hoc compositions *equaled* the weight of the overwhelming trial evidence of Sutton's guilt. As we've indicated, we don't believe that these two documents bring the record evidence into anything approaching equipoise—and neither did the state postconviction court. But the point is that, *even assuming* that they did, Sutton's actual-innocence claim would *still fail* because equipoise isn't *nearly* enough: As we've said, at this stage of the case, Sutton must "present[ ] evidence so strong that a court cannot have confidence in the outcome of the trial[.]" *Schlup*, 513 U.S. at 316. In doing so, he must show—with *clear and convincing evidence*—that the postconviction court's decision to credit the trial evidence over the Laitinen Letter and the Smith Affidavit "lacked even fair support in the record." *Turner*, 339 F.3d at 1273. Since he's failed to do any of that, his actual-innocence claim comes up short.

We agree with Sutton that the best course would have been for the state postconviction court to hold a hearing on his actual-innocence claim. But "it is 'beyond debate' that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009). Sutton, in short, has failed to establish that "no reasonable juror would have found [him] guilty beyond a reasonable doubt in light of the new evidence." *Rozzelle*, 672 F.3d at 1011. His Amended Petition is, therefore, untimely.

### EVIDENTIARY HEARING

We don't need a hearing to develop the factual record in this case. *See Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) ("[A] district court need not hold a hearing if the allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record." (cleaned up)). Since the Amended Petition is plainly untimely, a hearing would simply waste judicial resources.

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Because no jurists of reason would debate the correctness of our procedural ruling, we **DENY** any request for a COA.

\*     \*     \*

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Amended Petition [ECF No. 12] is **DISMISSED** as time-barred, that any request for a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot.

**DONE AND ORDERED** in the Southern District of Florida on December 15, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Christopher Sutton, *pro se*
        counsel of record

23